IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ORIGIS USA LLC and GUY VANDERHAEGEN, | § § § | No. 461, 2024 |
| Plaintiffs Below, Appellants, | § § § § | Court Below–Superior Court of the State of Delaware |
| v. | § § | C.A. No. N23C-07-102 |
| GREAT AMERICAN INSURANCE COMPANY, AXIS INSURANCE COMPANY, MARKEL AMERICAN INSURANCE COMPANY, BRIDGEWAY INSURANCE COMPANY, RSUI INSURANCE COMPANY, ASCOT SPECIALTY INSURANCE COMPANY, ENDURANCE ASSURANCE COMPANY, BERKSHIRE HATHAWAY SPECIALTY INSURANCE CORPORATION, IRONSHORE INDEMNITY, INC., and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | § § § § § § § § § § § § § § § § § § | |
| Defendants Below, Appellees. | § § § | |

Submitted: May 7, 2025
Decided: July 23, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW** and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED in part**, **REMANDED in part**.

Brian M. Rostocki, Esquire, Anne M. Steadman, Esquire, REED SMITH LLP, Wilmington, DE *for Appellant Origis USA LLC and Guy Vanderhaegen*.

Hugh Lumpkin, Esquire, Miami, FL, Stephen T. Raptis, Esquire (*argued*), Washington DC, REED SMITH LLP, *Of Counsel for Appellant Origis USA LLC and Guy Vanderhaegen*.

John C. Phillips, Jr., Esquire, David A. Bilson, Esquire, PHILLIPS, MCLAUGHLIN & HALL, P.A., Wilmington, DE, *for Appellee AXIS Insurance Company*.

Shaun Michael Kelly, Esquire, Jarrett W. Horowitz, Esquire, Sara A. Barry, Esquire, CONNOLLY GALLAGHER LLP, Wilmington, DE, *for Appellee Great American Insurance Company*.

James K. Thurston, Esquire, Chicago, IL, Daniel E. Tranen, Esquire, St. Louis, MO, Erik J. Tomberg, Esquire (*argued*), Raleigh, NC, WILSON ELSER, *Of Counsel for Appellee Great American Insurance Company*.

Thaddeus J. Weaver, Esquire, DILWORTH PAXSON LLP, Wilmington, DE, *for Appellee Bridgeway Insurance Company*.

Michael J. Smith, Esquire, Bryan W. Petrilla, Esquire (*argued*), STEWART SMITH, West Conshohocken, PA, *Of Counsel for Appellee Bridgeway Insurance Company*.

Jennifer C. Jauffret, Esquire, Christine D. Haynes, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE, *for Appellee RSUI Indemnity Company*.

Courtney E. Scott, Esquire (*argued*), TRESSLER LLP, New York, NY, *Of Counsel for Appellee RSUI Indemnity Company*.

David J. Soldo, Esquire, MORRIS JAMES LLP, Wilmington, DE, *for Appellee Endurance Assurance Corporation*.

Michael D. Margulies, Esquire, Charles W. Stotter, Esquire, CARLTON FIELDS, P.A., New York, NY, *Of Counsel for Appellee Endurance Assurance Corporation*.

Bruce E. Jameson, Esquire, John G. Day, Esquire, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, DE, *for Appellee Berkshire Hathaway Specialty Insurance Company*.

James T. Sandnes, Esquire, SKARZYNSKI MARICK & BLACK LLP, New York, NY, *Of Counsel for Appellee Berkshire Hathaway Specialty Insurance Company*.

Robert J. Katzenstein, Esquire, Julie M. O'Dell, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, *for Appellee Ascot Specialty Insurance Company and Ironshore Indemnity, Inc*.

Kevin M. Mattessich, Esquire, Kevin Windels, Esquire, KAUFMAN DOLOWICH VOLUCK, New York, NY, *Of Counsel for Appellee Ascot Specialty Insurance Company and Ironshore Indemnity, Inc*.

Aaron M. Nelson, Esquire, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE, *for Appellee National Union Fire Insurance Company of Pittsburgh, PA*.

Krista M. Reale, Esquire, MARGOLIS EDELSTEIN, Wilmington, DE, *for Appellee Markel American Insurance Company*.

Michael F. Perlis, Esquire, Woodland Hills, CA, Patrick Stoltz, Esquire (*argued*), Valhalla, NY, KAUFMAN BORGEEST & RYAN LLP, *Of Counsel for Appellee Markel American Insurance Company*.

**VALIHURA**, Justice:

In this appeal, we review the Superior Court's order dismissing claims against two sets of insurers – the 2021 Insurers and the 2023 Insurers. We address two questions. *First*, does the No Action Clause in the 2021 Excess Policies render this action, including its claims for declaratory relief, premature because it was filed prior to the resolution of the Underlying Lawsuit? And *second*, whether Paragraphs 158 – 160 of the Underlying Amended Complaint comprise a separate Claim and, if they do, is the Claim barred by the Prior Acts Exclusions? The Superior Court answered the first question "yes," and as to the second, it held that there was no separate Claim, and even if there were, it was barred. We **AFFIRM** the Superior Court's judgment regarding Paragraphs 158 – 160, but we **REMAND** for further consideration of issues related to the No Action Clause.

## I. RELEVANT BACKGROUND

Origis USA LLC ("Origis USA") and Guy Vanderhaegen ("Vanderhaegen," with Origis USA, the "Insureds") appeal the May 9, 2024 Memorandum Opinion and Order issued by the Superior Court granting Motions to Dismiss this action ("May 9 Order") and the June 26, 2024 Bench Ruling denying their Motion for Clarification of the May 9 Order ("June 26 Clarification Bench Ruling").

Former investors in Origis USA's former parent company (the "Investors") sued the Insureds in an action pending in federal district court for the Southern District of New York (the "Underlying Lawsuit"). The Investors sought and continue to seek hundreds of millions of dollars in damages. The Insureds have incurred, and will continue to incur

4

additional costs in the event of a settlement or judgment (collectively "Insured Losses").[1] The Insured Losses are covered by directors and officers liability ("D&O") policies (collectively, the "Policies") issued by the appellee insurers (collectively, the "Insurers").

### A. *The Parties*

This appeal arises out of the Underlying Lawsuit. Two sets of defendant insurers provided directors and officers liability insurance to the Insureds for separate policy periods commencing in 2021 and 2023, respectively.

The first set of defendants/appellees is the 2021 Insurers, also referred to collectively as the "First Tower Insurers." These insurers include Great American Insurance Company ("Great American"), which issued the Primary Policy for the 2021 Insurers, as well as Markel, AXIS, and North American Specialty Insurance Company which issued excess policies. These excess policies "follow form" to the Great American Policy.

Plaintiffs seek coverage for the Underlying Lawsuit, including reimbursement of **Costs of Defense**[2] incurred in the defense of that matter. The Insureds asserted two causes of action against the 2021 Insurers: declaratory judgment and breach of contract (against Great American).

---

[1] As a result of motions to dismiss in the Underlying Lawsuit, Origis USA is no longer a party in that action. However, Origis USA maintains that it incurred substantial Defense Costs prior to its dismissal and continues to incur certain Defense Costs related to the Underlying Lawsuit.

[2] Bolded terms shall have the meaning ascribed to them in the Great American Policy, where they are defined. *See* App. to Opening Br. at A00085–00182 (Compl. Ex. A (Great American Policy)).

The second set of defendants/appellees is comprised of RSUI Indemnity Company ("RSUI"), Ascot Specialty Insurance Company ("Ascot"), Endurance Assurance Corporation ("Endurance"), Berkshire Hathaway Specialty Insurance Corporation ("Berkshire"), Ironshore Indemnity, Inc. ("Ironshore"), and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") (collectively, "2023 Excess Insurers"),[3] as well as Bridgeway Insurance Co. ("Bridgeway"), which issued the primary policy. These entities are also referred to collectively as the "2023 Insurers" or, alternatively, the "Second Tower Insurers." These Insurers submitted answering briefs in opposition to the Insureds' appeal of the May 9, 2024 Memorandum Opinion and Order issued by the Superior Court that granted the 2023 Excess Insurers' motion to dismiss.[4] The Insureds' appeal pending against the 2023 Insurers does not involve Great American.

B. *The Relevant Policy Provisions*

1. *The 2021-22 Tower*

The first relevant tower of D&O policies that Origis bought and that covers Vanderhaegen (the "2021-22 Tower") had a policy period of June 10, 2021 to June 10, 2022, with an extended reporting period until November 18, 2027. In this tower, Great

---

[3] Markel American Insurance Company ("MAIC"), which also issued an excess policy for the Policy Period of February 4, 2023 to February 4, 2024 joined the 2023 Excess Insurers' Answering Brief.

[4] Appellants' Opening Brief addresses the trial court's June 26, 2024 Clarification Bench Ruling that denied their Motion for Clarification of the May 9, 2024 Memorandum Opinion and Order as it relates to arguments directed to the 2021 Tower of Insurance. The Answering Brief of the 2023 Excess Insurers responds only to the claims against the 2023 Insurers.

6

American issued the primary policy and North American, AXIS, and Markel issued follow-form excess policies in that ascending order. After the applicable retention, each of the First Tower Insurers had a $5 million limit.

The Policy provided Origis with the option to purchase either "Duty-to-Defend" coverage or "Indemnity" coverage, and Origis elected to purchase the "Indemnity" coverage:

| | |
|---|---|
| Item 3. | Defense Coverage – The **Named Entity** elects the following defense coverage applicable to all **Liability Coverage Parts** designated as "Included in Policy" in Column 1. of Item 4. of the Declarations: |
| | ☐ Duty-to-Defend  ☒ Indemnity |

This election may not be amended after the inception of the **Policy Period** identified in Item 2. [5]

Because Origis elected "Indemnity" coverage, the Policy states that "it shall be the duty of the **Insured** and not the **Insurer** to defend **Claims** under any **Liability Coverage Part** …."[6] Accordingly, the Insureds have the duty to defend themselves in the Underlying Lawsuit.

### a. The Allocation Provision

The Allocation Provision (Section V.B.) applies to any **Claim** involving "both covered and uncovered matters pursuant to this Policy[.]"[7] Under the Allocation Provision, had the Insureds elected "Duty to Defend" coverage, for any **Claim** including both covered and uncovered matters, the Insureds would have been entitled to "one hundred percent (100

---

[5] App. to Opening Br. at A00086 (Compl. Ex. A (Great American Policy)).

[6] *Id.* at A00108 (Compl. Ex. A (Great American Policy § VI.B.(1))).

[7] *Id.* at A00107 (Compl. Ex. A (Great American Policy § V.B.)).

%) of reasonable and necessary **Costs of Defense** incurred ....."[8]  Instead, under the elected "Indemnity" coverage, the Allocation Provision provides the parties shall use their "best efforts"[9] for an allocation;  however, "if there is no agreement on an allocation of **Loss**, the **Insurer** shall advance **Costs of Defense** and any other **Loss** which the **Insurer** believes to be covered under this Policy until a different allocation is negotiated, arbitrated or judicially determined."[10]  Here, since there was no agreement on allocation, the Policy permits Great American to advance **Costs of Defense** it "believes to be covered."  Great American asserts that it has done so whereas the Insureds assert the Great American failed to satisfy this requirement.

   b. *The Advancement Provision*

Separate from the Allocation Provision is the Policy's Advancement Provision (Section VI.B.), which governs the advancement of **Costs of Defense**.  The Advancement Provision provides that "upon written request, the **Insurer** shall advance **Costs of Defense** in any **Claim** prior to its final disposition, provided such **Claim** is covered by this Policy[,]" and that "[a]ny advancement shall be on the condition that:

> (c) the **Insureds** and the **Insurer** have agreed upon the allocated portion of the **Costs of Defense** attributable to covered **Claims** against the **Insureds**; provided, however, if there is no agreement on an allocation of **Costs of Defense**, the **Insurer** shall advance **Costs of Defense** which the **Insurer**

---

[8]  *Id.* (Compl. Ex. A (Great American Policy § V.A.(1)).  Great American acknowledged this in its brief and at oral argument before our Court.  Great Am. Ins. Co. Answering Br. at 23; Oral Argument Video at 32:56–33:05, https://courts.delaware.gov/supreme/oralarguments/.

[9]  Great American provided the Insureds with a 14-page "allocation analysis."  App. to Opening Br. at A00613–25 (Compl. Ex. O (Great American Allocation Analysis)).

[10]  *Id.* at A00107 (Compl. Ex. A (Great American Policy § V.B.)) (emphasis in original).

believes to be covered under this Policy until a different allocation is negotiated, arbitrated or judicially determined[.][11]

### c. The No Action Clause

Great American and the Insureds also dispute the effect of the Policy's No Action Clause with the Insurers arguing that the clause renders this litigation premature, whereas the Insureds argue that this litigation may proceed despite the clause. The No Action Clause provides that:

> With respect to any **Liability Coverage Part**, no action shall be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all the terms of this Policy, and until the **Insured's** obligation to pay has been finally determined by an adjudication against the **Insured** or by written agreement of the **Insured**, claimant and the **Insurer**.[12]

### 2. The 2023-24 Tower

The second relevant tower of D&O insurance (the "2023-24 Tower") had a policy period of February 4, 2023 to February 4, 2024.[13] In this timeframe, Bridgeway issued the primary policy, and RSUI, Ascot, Endurance, Berkshire Hathaway, Ironshore, Markel, and National Union each issued excess policies in that ascending order.[14] After the applicable retention, each of the 2023 Insurers had a $2.5 million limit.

Each of the 2023-24 Tower's policies had a provision excluding coverage for claims arising out of wrongful acts that first occurred before November 18, 2021 (the "Prior Acts

---

[11] *Id.* at A00108 (Compl. Ex. A (Great American Policy § VI.B.(3)) (emphasis in original).

[12] *Id.* at A00111 (Compl. Ex. A (Great American Policy § XI.A.)) (emphasis in original).

[13] *Id.* at A00075 (Compl. ¶ 28).

[14] *Id*. (Compl. ¶¶ 29–30).

Exclusions").[15]   There are slight differences in the way each Insurer chose to word this exclusion, but the substance of the exclusions has uniform application here.   Most importantly, each exclusion incorporates the concept of excluding claims that arise out of a wrongful act that first occurred before November 18, 2021.[16]  RSUI's first-layer excess policy reflects a fairly representative example, stating:

> The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributed to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to <u>November 18, 2021</u>.[17]

The relevant insuring agreements of the Bridgeway Policy provide in pertinent part that:

### A.  Individual Non-Indemnified Liability

> The Insurer shall pay on behalf of an **Insured Person**, **Loss** arising from a **Claim** first made against an **Insured Person** during the **Policy Period**, or Extended Reporting Period, if purchased, provided that such **Loss** is not indemnified by the **Company**.

### B.  Individual Indemnified Liability

> The Insurer shall pay on behalf of a **Company**, **Loss** arising from a **Claim** first made against the **Insured Person** during the **Policy Period**, or the Extended Reporting Period, if purchased, provided that the **Company** indemnifies in the **Insured Person** for such **Loss** as permitted or required by law.

---

[15] *See* App. to Answering Br. of Certain Defs.-Below/Appellees Excess Insurers in the 2023-2024 Tower at B00029–33 (App. A).  This appendix collates the various prior acts exclusions from the 2023 Excess Insurers' policies into a single document.

[16] *Id.*; *see also* App. to Opening Br. at A00319 (Compl., Ex. E at 64 (Bridgeway's prior acts exclusion endorsement)).

[17] App. to Opening Br. at A00334 (Compl., Ex. F at 7) (emphasis in original).

### C. Company Liability

The Insurer shall pay on behalf of a **Company**, **Loss** arising from a **Claim** first made against the **Company** during the Policy Period, or the Extended Reporting Period, if purchased.[18]

A **Claim**, in the relevant part means any:

1. Written demand first received by an **Insured** for monetary, non-monetary, declaratory or injunctive relief;

2. Civil proceeding commenced by the service of a complaint or similar pleading;

….

against an **Insured** for a **Wrongful Act**[.][19]

"**Wrongful Act**" is defined as, "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted by:

**1.** Any **Insured Person** while acting in his or her capacity as such;

**2.** Any matter claimed against any **Insured Person** solely by reason of his or her status as such; or

**3.** Any **Company**, for the purposes of coverage under Insuring Agreement C – Company Liability.[20]

The Insureds point to three paragraphs in the Underlying Amended Complaint and argue that they are alleged Wrongful Acts that occurred after November 18, 2021. Those paragraphs allege:

---

[18]  *Id.* at A00274 (Compl., Ex. E (Bridgeway's Directors and Officers Liability § I-Insuring Agreements)).

[19]  *Id.* at A00276 (Compl., Ex. E (Bridgeway's Directors and Officers Liability § VI-Definitions, A.)).

[20]  *Id*. at A00278–79 (Compl., Ex. E (Bridgeway's Directors and Officers Liability § VI-Definitions, N.)).

158. In conjunction with the Indemnity Notice, Plaintiffs demanded access to the information from Origis necessary to carry out a complete investigation of their claims. Plaintiffs had the right to this information pursuant to Section 8.4 of the SRA.

159. Defendants produced only a small portion of the information Plaintiffs requested. Rather than a complete production, Defendants proposed a list of search terms, to which Plaintiffs proposed revisions. But then Defendants refused to produce all documents responsive to their own proposed search terms. Defendants instead produced the Antin transaction documents as well as an overwhelming amount of irrelevant technical information from the Antin data room. Beyond that, Defendants produced *only* certain documents expressly relating to discussions with investment bankers and the financing of the buyout and largely did so from the email account of a single custodian – Vanderhaegen. Defendants also failed to provide access to Origis employees for interviews as provided for in the SRA.

160. The failure to provide all information necessary for Plaintiffs to investigate their claims breached Plaintiffs' information access rights in the SRA. But for these breaches, Plaintiffs would be able to set forth their claims with even more particularity.[21]

They argue that this "information breach claim" is a separate "Claim" that does not "arise from" pre-cut-off date allegations. The 2023 Insurers disagree arguing that the Superior Court correctly determined that Paragraphs 158 – 160 of the Underlying Amended Complaint do not comprise a separate claim implicating the policies and that, in any event, the Prior Acts Exclusions preclude coverage entirely for the underlying lawsuit.

*C. Contentions Below*

Origis filed its Complaint on July 13, 2023 and the Insurers filed Motions to Dismiss on October 4, 2023. Great American argued that the coverage action violates the Policy's

---

[21] *Id.* at A00582 (Underlying Am. Compl. ¶¶ 158–160).

No Action Clause and should be dismissed.[22]  It argued that the No Action Clause is a

"condition precedent" to coverage under the Policy.  It framed its "condition precedent"

argument as follows:

> Here, the "condition precedent" of the Policy is two-fold – no action "*shall be*" taken against Great American "*unless*" as a condition precedent:  (1) "there has been full compliance with all the terms of this Policy" ("Condition Precedent 1"); "*and*" (2) "until the **Insured's** obligation to pay has been finally determined by an adjudication against the Insured or by written agreement of the **Insured**, claimant and the **Insurer**" ("Condition Precedent 2").[23]

Great American argued that the use of the conjunctive term "and" in the Policy, means

both Condition Precedent 1 and Condition Precedent 2 must be fully and completely

satisfied.  It then argued that there is no allegation in this case that the Insureds' obligations

in the Underlying Lawsuit have been finally determined by adjudication or by settlement.

According to Great American, this case must be dismissed because Condition Precedent 2

of the No Action Clause has not been satisfied.[24]

---

[22]  *Id.* at A00855 (Opening Br. in Support of Def. Great American Insurance Company's Motion to Dismiss [hereinafter:  Great American Motion to Dismiss Opening Br.] at 10).

[23]  *Id.* at A00856 (Great American Motion to Dismiss Opening Br. at 11) (emphasis in Great American Motion to Dismiss Opening Br.).

[24]  *Id.* at A00862 (Great American Motion to Dismiss Opening Br. at 17).  Great American also argued that dismissal is warranted under Rule 12(b)(2), *id.*, and that, alternatively, the "First-Filed" coverage action by Great American in Florida mandates dismissal or a stay of the Second-Filed Coverage Action in Delaware.  *Id.* at A00870 (Great American Motion to Dismiss Opening Br. at 25).

The 2023 Excess Insurers filed an Opening Brief in support of their motion to dismiss[25] arguing that the Prior Acts Exclusions in the 2023-2024 Excess Policies preclude coverage entirely for the underlying lawsuit.[26] These Insurers argued that the Underlying Amended Complaint alleges conduct occurring exclusively before the Prior Acts Date in the Excess Policies. Further, these Insurers argued that to the extent the Underlying Amended Complaint references events after November 2021, such events unquestionably "arise from" or are logically and factually tied to the pre-November 18, 2021 conduct and, thus, they also fall squarely within the Prior Acts Exclusions.

Bridgeway argued that the Complaint does not allege facts which, even assumed to be true, would establish the Insureds' entitlement to defense and indemnity under the Bridgeway Policy.[27] Bridgeway argued that the Insureds do not allege in their Complaint that any post-November 18, 2021 Wrongful Acts allegedly took place that give rise to a Claim. Thus, according to Bridgeway, the Complaint is manifestly deficient and should be dismissed.

---

[25] National Union Fire Insurance Co. of Pittsburgh, PA joined the 2023 Excess Insurers' Opening Brief. *Id.* at A00826–33 (Defendants National Union Fire Insurance company of Pittsburgh, PA.'s Joinders in the 2023-24 Excess Insurers' Motion to Dismiss).

[26] *Id.* at A00896 (Opening Br. of Certain Defendant Excess Insurers in the 2023-2024 Tower in Support of Their Joint Motion to Dismiss the Complaint [hereinafter: Certain 2023-2024 Tower Insurers Motion to Dismiss Opening Br.] at 12).

[27] *Id.* at A00925–26 (Opening Brief in Support of Defendant Bridgeway Insurance Company's Motion to Dismiss Pursuant to Civil Rule 12(b)(6); Or, in the Alternative, Motion for a More Definite Statement Pursuant to Civil Rule 12(e) [hereinafter: Bridgeway Motion to Dismiss Opening Br.] at 10–11).

AXIS argued that it should be dismissed from this case without prejudice because there is no ripe dispute between the Insureds and AXIS.[28] According to AXIS, coverage under the AXIS Policy does not attach until underlying limits of $10 million have been paid, and the Insureds do not allege that they have incurred anything approaching $10 million in defense costs in the Underlying Action.[29]

The Insureds argued that Great American's No Action Clause arguments have been rejected by courts in Delaware and across the country.[30] They quoted *Wright Construction Co. v. St. Lawrence Fluorspar, Inc.* and the authorities cited therein.[31] The Insureds argued that many courts have recognized that no action clauses are intended primarily to preclude third parties injured by the conduct of an insured tortfeasor from directly suing the tortfeasor's insurer until the third party's claims against the insured are resolved.[32]

---

[28] *Id.* at A00639 (Opening Br. in Support off Motion to Dismiss or Stay by Defendant AXIS Insurance Company [hereinafter: Axis Motion to Dismiss Opening Br.] at 7).

[29] *Id.* at A00640 (Axis Motion to Dismiss Opening Br. at 8). In the alternative, AXIS argued that the action should be stayed against AXIS. *Id.* at A00643 (Axis Motion to Dismiss Opening Br. at 11).

[30] *Id.* at A00971 (Plaintiff Origis USA LLC's Consolidated Brief in Opposition to Defendant Insurers' Motions to Dismiss hereinafter: Insureds Motion to Dismiss Answering Br.] at 27).

[31] *Id.* at A00972 (Insureds Motion to Dismiss Answering Br. at 28) (quoting *Wright Constr. Co. v. St. Lawrence Fluorspar, Inc.*, 254 A.2d 252, 253–54 (Del. Super. 1969)).

[32] *Id.* at A00972–73 (Insureds Motion to Dismiss Answering Br. at 28–29) (citing *Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252, 254 (10th Cir. 1981); *Hawkins, Ash, Baptie & Co., LLP v. Charter Oak Fire Ins. Co.*, 2001 WL 34381113 (W.D. Wis. June 13, 2001); *Duke Univ. v. St. Paul Mercury Ins. Co.*, 384 S.E.2d 36, 41 (N.C. Ct. App. 1989); *Fight Against Coercive Tactics Network v. Coregis Ins. Co.*, 926 F. Supp. 1426, 1435 (D. Colo. 1996); Allan D. Windt, *Insurance Claims and Disputes: Representation of Insurance Companies and Insured*, § 8.06 n.41 (1995)).

According to the Insureds, these decisions do not preclude the insured from bringing claims against its own insurer prior to resolution of the underlying matter.

The Insureds argued that many courts recognize that no action clauses do not preclude an insured from seeking declaratory relief prior to resolution of the underlying claims against the insured.[33]  Further, the Insureds argued that Great American breached its coverage obligations pointing to the June 9 Coverage Letter, as well as to the Complaint's allegation that Great American breached its duty to defend.[34]

The Insureds also opposed AXIS' Motion to Dismiss or Stay.  They argued that Delaware applies a broad legal standard for ripeness of declaratory judgment claims and that the damages sought in the Underlying Lawsuit implicate the Axis Policy.  Further, the Insureds argued that the Axis policy is implicated by defense costs alone.

Addressing the motions from the 2023 Insurers, the Insureds argued that the Complaint provides notice of the Insureds' claims and alleges facts establishing that the Underlying Lawsuit is within the coverage provisions of the Bridgeway Policy.

---

[33] *Id.* at A00973–74 (Insureds Motion to Dismiss Answering Br. at 29–30) (citing *Tesler v. Certain Underwriters at Lloyd's, London (In re Spree.com Corp.)*, 2002 WL 1586274 (Bankr. E.D. Pa. June 20, 2002); *McNally v. Providence Wash. Ins. Co.*, 698 A.2d 543, 547 (N.J. Super. Ct. App. Div. 1997); *Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co.*, 873 F.2d 229, 233 (9th Cir. 1989); *Owens-Corning Fiberglas Corp. v. Allstate Ins. Co.*, 660 N.E.2d 755, 760–62 (Ohio C.P. 1993); *W & J Rives, Inc. v. Kemper Ins. Grp.*, 374 S.E.2d 430, 434 (N.C. Ct. App. 1988); *Paxton & Vierling Steel Co. v. Great Am. Ins. Co.*, 497 F. Supp. 573, 582 (D. Neb. 1980)).

[34] *Id.* at A00975–76 (Insureds Motion to Dismiss Answering Br. at 31–32).  Insureds also asserted that, contrary to Great American's arguments, the court did have personal jurisdiction of Great American and the other Insurers.  *Id.* at A0977–86 (Insureds Motion to Dismiss Answering Br. at 33–42).

The Insureds recognized that that many, if not most, of the Wrongful Acts alleged in the Underlying Amended Complaint allegedly occurred prior to the Cut-Off Date; however, they argued that "the [Underlying Amended Complaint] *also* plainly alleges Wrongful Acts that allegedly occurred *after* the Cut-Off Date—including [the Insureds'] alleged refusal to produce documents and information requested in the Investors' Indemnity Notice, purportedly in breach of the SRA, two years after the SRA was executed."[35]  The Insureds argued that "the applicable legal standard for interpreting 'arising out of' and related language is the 'fundamentally identical' test – not the 'some meaningful linkage' test[.]"[36]  Further, they argued that the 2023 Excess Insurers did not meet their burden of proof, regardless of which standard applies.

## D. *The Superior Court's May 9 Order*

The Superior Court began by observing "two key issues" that would be the focus of its opinion.[37]  It discussed the No Action Clause as the first issue and held that it precluded litigation against the 2021-22 Tower.  The court cited Delaware's high regard for freedom of contract and observed that "[t]he Court's reluctance to relieve a party of its voluntary

---

[35] *Id.* at A01018–19 (Insureds Motion to Dismiss Answering Br. at 74–75) (emphasis in original).

[36] *Id.* at A01022 (Insureds Motion to Dismiss Answering Br. at 78) (capitalization in heading removed).  The 2023 Excess Insurers replied that in *First Solar*, this Court held that whether a claim relates back to an earlier claim under a claims-made liability policy is not determined by the "fundamentally identical" standard, but rather, must be determined by the plain language of the policy at issue.  *See id.* at A01167 (Reply Br. of Certain Def. Excess Insurers in the 2023-24 Tower in further Support of Their Joint Motion to Dismiss the Complaint at 8) (citing *First Solar, Inc. v. Nat'l Union Fire Ins. Co.*, 274 A.3d 1006, 1007 (Del. 2022)).  We agree with the 2023 Excess Insurers.  *See First Solar*, 274 A.3d at 1013 ("Whether a claim relates back to an earlier claim is decided by the language of the policy, not a generic 'fundamentally identical' standard.").

[37] *Origis USA LLC v. Great Am. Ins. Co.*, 2024 WL 2078226, at *1 (Del. Super. May 9, 2024).

arrangements is especially strong when a sophisticated party, like the ones here, asks for such relief."[38]

Next, the court rejected the Insureds' reliance on *Wright Construction Co. v. St. Lawrence Fluorspar, Inc.* The court noted that "in the half-century since *Wright* was decided, no Delaware court has cited to it."[39] The court also pointed out that *Wright* does not set forth the particular language used, and it did not explain its conclusion "except to say that it was based upon '[a] consideration of the authorities.'"[40] The Superior Court observed that it enforced a nearly verbatim no action clause in *Rodriguez v. Great American Insurance Co.*,[41] but the court was not persuaded by that decision because a different portion of the no action clause was at issue. Nonetheless, the court concluded that "*Rodriguez* at least indicates that there is no inherent presumption in Delaware law that an insured is at all times guaranteed the right to sue its insurer."[42]

Finally, the court rejected the use of extra-contractual sources observing that extrinsic evidence has no role in the interpretation of an unambiguous contract. The court wrote that since the plain language of the No Action Clause can only be reasonably read as a bar on actions against the 2021-22 Insurers until there is a final determination of the Insureds' liability and full compliance with the relevant policy, the Insureds' outside

---

[38] *Id.* at *5.

[39] *Id.* at *6.

[40] *Id.* (quoting *Wright Constr. Co. v. St. Lawrence Fluorspar, Inc.*, 254 A.2d 252, 253 (Del. Super. 1969)).

[41] 2022 WL 591762 (Del. Super. Feb. 23, 2022).

[42] *Origis*, 2024 WL 2078226, at *6.

18

sources could not dictate a different result. This led the court to enforce the No Action Clause as written and grant the 2021-22 Insurers' motions to dismiss.

Next, the court turned to the 2023-24 Tower and concluded that the relevant policy language precluded coverage. The court held that the Insureds had not established that the specific allegations they relied upon constituted a "Claim" as defined in the Bridgeway policy. Instead, the court viewed those allegations as little more than an aside in a lengthy complaint that asserted a number of Claims—but only Claims for pre-November 2021 Wrongful Acts. The court observed that the Prior Acts Exclusions bar coverage for Claims that "arise out of" a Wrongful Act that first occurred before November 2021 and wrote that "it is difficult to conceive a much better fit for the term 'arising out of' than the way a cover-up is predicated on an initial wrong."[43] The court then granted the 2023 Insurer's motions to dismiss after concluding that even if the Paragraphs constituted a Claim, that Claim would be precluded by the 2023-24 Tower's Prior Acts Exclusions.

### E. Contentions Regarding the Insureds' Motion for Clarification

The Insureds thereafter filed a Motion for Clarification on May 16, 2024. The Insureds requested clarification as to whether the No Action Clause applies to the Insurers' "express contractual obligation to advance defense costs, which is stated as a ***current*** obligation, regardless of whether an obligation to indemnify may later exist."[44] The Insureds argued that it may be years before they have any recourse if the Court's No Action

---

[43] *Id.* at *8.

[44] App. to Opening Br. at A01326 (Motion for Clarification ¶ 1) (emphasis in original).

Clause ruling applies to the expressly current Advancement Obligation and that the practical effect would be to deprive the Insureds' of the promised benefit of the current defense cost coverage they purchased—essentially writing the Advancement Obligation out of the Policy and rendering it a "nullity."

Additionally, the Insureds argued that the Insurers did not satisfy the Advancement Obligation because: (i) "[t]he Insurers have failed to pay even the 'believed to be covered' amount, which must be paid 'until a different allocation is . . . judicially determined';" (ii) "[t]he Insurers have breached—and anticipatorily breached—their obligations under the Policy[;]" and (iii) "Great American's offer to advance a mere 10% of Plaintiffs' defense costs was 'arbitrary and wrongful,' and therefore not in good faith."[45]

In response, Great American argued that the Insureds were seeking to reargue a legal point that they had failed to raise in briefing opposing the Insurers' motions to dismiss.[46] Great American also argued that the Insureds' nullity argument was first made during oral argument on the motion to dismiss and was, therefore, waived.

According to Great American, the Insured's argument also failed on the merits because there are no exceptions to the Policy's "condition precedent" language as to the payment **Costs of Defense**, and none should be added to this unambiguous language by the court. Great American further argued that courts have routinely held that advancement

---

[45] *Id.* at A01330–31 (Motion for Clarification ¶ 7) (internal citations omitted).

[46] *Id.* at A01334 (Def. Great American Insurance Company's Opp. to Pl's Motion for Clarification [hereinafter: Great American Opp. to Motion for Clarification] ¶ 1). In the Motion for Clarification, the Insureds cited a passage from the March 23, 2024 oral argument where then-counsel raised the advancement "nullity" argument. *Id.* at A01328 (Motion for Clarification ¶ 4).

of what "the Insurer believes to be covered" language is unambiguous and enforceable, even in cases like this where the amount is ten percent.[47]

### F. The Superior Court Denies the Insureds' Motion for Clarification

The Superior Court observed that a motion for clarification is treated as a motion for reargument made pursuant to Superior Court Civil Rule 59(e).[48] In its June 26, 2024 Clarification Bench Ruling, the Superior Court noted that the Insureds failed to raise the advancement issue in their briefing on the Motion to Dismiss, only raised it during oral argument, and, therefore, the court deemed the issue waived. The court further held that even if the issue had been properly raised in the briefs, the arguments were still unavailing.

The court observed that the primary policy conditions all advancements of defense costs on an agreement between the Insureds and Insurer as to the allocated portion of the defense costs. The court noted that otherwise, the primary policy provides that the Insurer need only advance those defense costs that the Insurer believes to be covered under the primary policy until another allocation is determined by a negotiation, arbitration, or judicial determination. The court concluded that consistent with the No Action Clause, the Insureds "require a final determination of the obligation to pay to file an action against Great American and any Defendants whose policies follow the primary policy."[49]

---

[47] *Id.* at A01337–38 (Great American Opp. to Motion for Clarification ¶ 5) (citing *Seeger v. Gulf Underwriters Ins. Co.*, 2005 WL 6772545, at *2 (N.D. Ill. Mar. 17, 2005)).

[48] *Origis USA LLC v. Great Am. Ins. Co.*, C.A. No. N23C-07-102, at 22:9–12 (Del. Super. June 26, 2024) (TRANSCRIPT).

[49] *Id.* at 24:15–19.

21

## II. CONTENTIONS ON APPEAL

On appeal, the Insureds argue that the Superior Court erred both as to its interpretation of the No Action Clause and as to whether the Claim implicates the 2023 Insurers.

Regarding the No Action Clause, the Insureds advance a four-pronged argument. *First*, they argue that the Superior Court's reading of the No Action Clause directly conflicts with the 2021 Insurers' express advancement obligation. According to the Insureds, there is no way to square language requiring Great American to advance Costs of Defense in any Claim prior to its final disposition with the Superior Court's reading of the No Action Clause. Further, the Insureds argue that "[t]his irreconcilable policy language conflict has been recognized by numerous courts across the country—which the Superior Court simply disregarded."[50] They argue that the Superior Court's No Action Clause rulings are wholly inconsistent with Delaware's reasonable expectations doctrine— which holds that where policy language is ambiguous or conflicting, it must be interpreted to protect the insured's objectively reasonable expectations of coverage. The Insureds further argue that the Superior Court erred in relying on the clause as a basis to dismiss the Insureds' Complaint in light of the allegations that the 2021 Insurers had actually (or anticipatorily) breached their obligations to advance the Insureds' Defense Costs. Finally, the Insureds argue that the Superior Court's ruling that the Insureds waived their

---

[50] Opening Br. at 18 (citing *Tesler v. Certain Underwriters at Lloyd's, London (In re Spree.com Corp.)*, 2002 WL 1586274 (Bankr. E.D. Pa. June 20, 2002); *Fight Against Coercive Tactics Network v. Coregis Ins. Co.*, 926 F. Supp. 1426, 1435 (D. Colo. 1996); *Mid-Continent Cas. Co. v. Advantage Med. Elecs, LLC*, 196 So. 3d 238, 250 (Ala. 2015)).

advancement argument is incorrect, that where a matter can fairly be decided on its merits it should be, and that Delaware law strongly disfavors technical defenses like waiver.

*Second*, the Insureds argue that the Superior Court's reading of the No Action Clause is contrary to Delaware law. They contend that the dearth of cases citing *Wright* does not undermine its precedential value and that the Superior Court's interpretation of the No Action Clause is inconsistent with the purpose of Delaware's Declaratory Judgment Act.

*Third*, the Insureds argue that the Superior Court's No Action Clause rulings are contrary to the great weight of precedent nationwide. They cite *Paul Holt Drilling, Inc. v. Liberty Mutual Insurance Co.* and various treatises[51] and conclude that the Superior Court's failure to substantively address—let alone distinguish—the sound reasoning of the overwhelming majority of courts that have addressed this issue is reversible error.

*Fourth*, the Insureds argue that the Superior Court's No Action Clause rulings contravene Delaware public policy. They argue that Delaware courts have recognized on numerous occasions that Delaware has a particularized public interest in having coverage disputes involving D&O policies issued to Delaware-formed entities (like Origis USA) adjudicated under Delaware law, and that under the Superior Court's overly broad reading of the No Action Clause, insurers could evade their indemnity obligations for settlements altogether by simply refusing to agree to *any* proposed settlement of an underlying action.

---

[51] *Id.* at 29–30 (citing *Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252 (10th Cir. 1981); Allan D. Windt, *Insurance Claims and Disputes: Representation of Insurance Companies and Insured*, § 8.06 n.41 (1995); 1 *New Appleman on Insurance Law Library Edition* § 7.05 (2024)).

23

Regarding whether the Claim implicates the 2023 Insurers, the Insureds argue that the Information Breach Claim is a distinct covered "Claim" and that it does not "arise from" pre-cut-off date Wrongful Acts. The Insureds argue that these alleged Wrongful Acts plainly are distinct from the preceding Wrongful Acts alleged in the Underlying Amended Complaint because they: (i) are based on an alleged breach of the SRA—as opposed to allegedly improper inducement to enter into the SRA in the first instance; (ii) allegedly occurred long after the SRA was executed; and (iii) are pled in a separate section of the Underlying Amended Complaint. Further, the Insureds argue that the Superior Court improperly drew inferences in favor of the Insurers when it was required to draw inferences in favor of the non-movant Insureds.

According to the Insureds, the mere fact that the Information Breach Claim is alleged in the same lawsuit as the pre-Cut-Off Date Wrongful Acts is not indicative—let alone determinative—of relatedness. They argue further that the Superior Court insufficiently analyzed "relatedness" and that its conclusion is unsupported by the express allegations in the Information Breach Claim.

Great American argues that the Superior Court correctly held that the Insureds' action violates the No Action Clause and should be dismissed. Great American argues that the No Action Clause is a "condition precedent" and Condition Precedent 2 of the No Action Clause has not been satisfied, meaning that this action is barred because the Insureds' obligations have not been finally determined. Great American argues that it has not denied coverage; instead, it has followed the Policy's express allocation and advancement provisions.

24

Great American further contends that the Insureds' "nullity" argument is waived, and that the No Action Clause does not conflict with the Insurers' advancement obligation. It maintains that the cases relied upon by the Insureds to challenge the plain language of the No Action Clause are distinguishable, and that the Insureds waived the argument that the Policy is ambiguous.

Bridgeway argues that the Bridgeway Policy undisputedly provides coverage only for suits for post-November 18, 2021, conduct, and that the Underlying Lawsuit is for pre-November 18, 2021 conduct.

The 2023 Excess Insurers present similar arguments. These Insurers argue that the Superior Court correctly held that Paragraphs 158 – 160 of the Underlying Amended Complaint do not form a separate "Claim" implicating coverage under the 2023 policies and that the Prior Acts Exclusions in the 2023 Excess Policies preclude coverage entirely for the Underlying Lawsuit.[52]

## III. STANDARD OF REVIEW

"'In reviewing the dismissal of a complaint under Rule 12(b)(6), the standard of appellate review is *de novo*.'"[53] "'This Court, like the trial court, must determine whether it appears with reasonable certainty that, under any set of facts that could be proven to

---

[52] RSUI Indemnity, Berkshire Hathaway, Endurance Assurance, Ascot Specialty, Ironshore Indemnity, National Union Fire, and Markel American Answering Br. at 19–22.

[53] *Thompson Street Capital P'rs IV, L.P. v. Sonova United States Hearing Instruments, LLC*, ___ A.3d ___ , 2025 WL 1213667, at *7 (Del. Apr. 28, 2025) (quoting *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000)).

support the claims asserted, the plaintiffs would not be entitled to relief.'"[54] "'That determination by this Court, as in the trial court, is generally limited to the factual allegations contained in the complaint.'"[55] "'When reviewing a Rule 12(b)(6) motion, a trial court must accept as true all of the well-pleaded allegations of fact, but is not required to accept as true conclusory allegations without specific supporting factual allegations.'"[56] "'Dismissal is appropriate when the defendant's interpretation is the only reasonable construction as a matter of law and that construction reveals that the plaintiff cannot sustain an actionable claim.'"[57] "'We also review the Superior Court's interpretation of an insurance [policy] *de novo*.'"[58] "Moreover, 'whether a contract is unambiguous is a question of law[.]"[59]

## IV. ANALYSIS

### A. Principles of Contract Interpretation

We begin by considering the principles of contract law that guide our analysis.

---

[54] *Id*. (quoting *McMullin*, 765 A.2d at 916) (internal quotation omitted).

[55] *Id.* (quoting *VLIW Tech., LLC v. Hewlett-Packard Co*., 840 A.2d 606, 611 (Del. 2003)).

[56] *Id.* (quoting *Page v. Oath Inc*., 270 A.3d 833, 842 (Del. 2022) (internal quotations omitted)).

[57] *Id.* (quoting *Fortis Advisors LLC v. Medtronic Minimed, Inc*., 2024 WL 3580827, at *9 (Del. Ch. July 29, 2024) (citation omitted)).

[58] *First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 274 A.3d 1006, 1011–12 (Del. 2022) (quoting *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011)).

[59] *BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd*., 319 A.3d 310, 322 (Del. 2024) (quoting *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp*., 206 A.3d 836, 847, 847 n.68 (Del. 2019)).

*1. General Principles*

"'Delaware is a contractarian state that holds parties' freedom of contract in high regard.'"[60] "'When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language.'"[61] "'Clear and unambiguous language is reasonably susceptible of *only one* interpretation.'"[62] "'Language from a contract need not be perfectly clear for an interpretation of it to be deemed as the only reasonable one.'"[63]

"'A provision in a contract is ambiguous when the provision in controversy is reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"[64] "'Where no ambiguity exists, the contract will be interpreted according to the 'ordinary and usual meaning' of its terms.'"[65] "'The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous.'"[66]

---

[60] *Thompson*, 2025 WL 1213667, at *8 (quoting *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 487, (Del. 2024)); *see also Stream TV Networks, Inc. v. SeeCubic, Inc*., 279 A.3d 323, 355 (Del. 2022) ("Delaware is a contractarian state.").

[61] *Thompson*, 2025 WL 1213667, at *8 (quoting *BitGo*, 319 A.3d at 322).

[62] *Id*. (quoting *BitGo*, 319 A.3d at 322) (emphasized added in *BitGo*) (internal quotation omitted).

[63] *Id*. (quoting *BitGo*, 319 A.3d at 322).

[64] *Id.* (quoting *BitGo*, 319 A.3d at 323) (internal quotation omitted).

[65] *Id.* (quoting *Town of Cheswold v. Cen. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018)).

[66] *Id.* (quoting *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021)).

## 2. *Other Principles That Apply to Insurance Contracts*

"With all insurance policies, '[t]he scope of an insurance policy's coverage ... is prescribed by the language of the policy.'"[67]  "In construing the language of [an insurance policy,] the Court should interpret the language in the same manner as it would be understood by an objective, reasonable third party.  A court should first seek to determine the parties' intent from the language of the insurance contract itself—the mutual intent at the time of contracting."[68]  "Absent ambiguity, contract terms should be accorded their plain, ordinary meaning."[69]

"[W]hen there is a coverage dispute, '[t]he language of the policy and the allegations of the complaint must be construed together to determine the insurers' obligation.'"[70] "Normally, unless a contract is found to be ambiguous, a court should interpret its language as it would be understood by an objective, reasonable third party, and ascribe to it its ordinary and usual meaning."[71]  "However, '[b]ecause an insurance policy is an adhesion contract and is not generally the result of arms-length negotiation, courts have developed rules of construction which differ from those applied to most other contracts.'"[72]  This has

---

[67]  *First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 274 A.3d 1006, 1013 (Del. 2022) (quoting *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997)).

[68]  *Ace Am. Ins. Co. v. Rite Aid Corp.*, 270 A.3d 239, 245 (Del. 2022) (quotations omitted).

[69]  *Id.*

[70]  *Id.* (quoting *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)) (applying Pennsylvania law but observing that Pennsylvania and Delaware law "do not conflict on the insurance coverage issues presented here.").

[71]  *Ferrellgas P'rs L.P. v. Zurich Am. Ins. Co.*, 319 A.3d 849, 868 (Del. 2024) (internal quotations omitted).

[72]  *Id.* (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).

led this Court to adopt the doctrine of reasonable expectations and "[a] fundamental premise of the doctrine is that 'the policy will be read in accordance with the reasonable expectations of the insured so far as its language will permit.'"[73]

### B. Remand is Appropriate Regarding the No Action Issue

The Superior Court ruled narrowly on the No Action issue because it focused, understandably, upon the issues presented by the parties. In its May 9 Order, the court focused on whether the No Action Clause was enforceable, largely relying on freedom of contract principles and policy considerations.[74] In its June 26 Clarification Bench Ruling, the court followed a similar analytical pathway when it concluded that "[n]either the primary policy nor the decision provides any basis for Plaintiffs to believe that the advancement of defense costs they describe is excepted from the No Action clause."[75]

---

[73] *Id.* (quoting *Hallowell*, 443 A.2d at 927) (internal quotation omitted). In *Ferrellgas*, we did not resolve the question of whether triggering conditions such as "conflict, pitfalls, or dubious fine print" can lead to the application of the reasonable expectations doctrine to an unambiguous contract. *Id.* at 868–70; *id.* at 869 n.140 ("We need not today definitively resolve the unsettled state of our Delaware case law because even applying *Hallowell*'s arguably broader formulation, as opposed to *Stoms*' narrower formulation, Ferrellgas would not prevail.").

[74] *Origis USA LLC v. Great Am. Ins. Co.*, 2024 WL 2078226, at *5–6 (Del. Super. May 9, 2024). The court wrote that the Insureds' "position is uncompelling with respect to the necessary 'strong showing that dishonoring [a] contract is required to vindicate a public policy even stronger than freedom of contract.'" *Id.* at *5 (quoting *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 676–77 (Del. 2024)).

[75] *Origis USA LLC v. Great Am. Ins. Co.*, C.A. No. N23C-07-102, at 24:11–14 (Del. Super. June 26, 2024) (TRANSCRIPT). The court stated that it "generally will not disturb a bargain because, in retrospect, it appears to have been a poor one. Hence, for the foregoing reasons, Plaintiffs' motion is denied." *Id.* at 25:3–6.

Although the Superior Court stated that the Insureds' advancement argument had been waived, it did address the advancement argument on the merits.[76] The substance of the Superior Court's merits ruling on the advancement issue is as follows:

> The No Action clause in the primary policy provides that there can be no action against the insurer until the insured's obligation to pay has been finally determined by an adjudication against the insured or by written agreement of the insured, claimant, and the insurer.
>
> The primary policy conditions all advancements of defense costs on an agreement between insureds and insurer as to the allocated portion of the defense costs.
>
> Otherwise, the primary policy provides that the insurer need only advance those defense cost that the insurer believes to be covered under the primary policy until another allocation is determined by a negotiation, arbitration, or judicial determination.
>
> Neither the primary policy nor the decision provides any basis for Plaintiffs to believe that the advancement of defense costs they describe is excepted from the No Action clause.
>
> Consistent with the No Action clause, Plaintiffs require a final determination of the obligation to pay to file an action against Great American and any Defendants whose policies follow the primary policy.
>
> Delaware law seeks to ensure freedom of contract and allow parties to enforce their bargains in our courts. Plaintiffs and Defendants are sophisticated parties who could have negotiated for different language in the primary policy and the excess policies.
>
> The [c]ourt generally will not disturb a bargain because, in retrospect, it appears to have been a poor one. Hence, for the foregoing reasons, Plaintiffs' motion is denied. It is so ordered.[77]

---

[76] We note that, in some circumstances, the trial court addressing an issue on the merits may be sufficient to fairly present it to the trial court and enable this Court's review on appeal. *See Lawson v. Preston L. McIlvaine Constr. Co., Inc.*, 552 A.2d 858, 1988 WL 141168, at *2 (Del. Dec. 7, 1988) (TABLE) ("Because the trial judge, *sua sponte*, addressed the merits of the section 2702 claim, the question was fairly presented to the Superior Court and is thus properly before this Court on appeal.").

[77] *Origis USA LLC v. Great Am. Ins. Co.*, C.A. No. N23C-07-102, at 23:18–25:7 (Del. Super. June 26, 2024) (TRANSCRIPT).

Given that the trial court did address the Insureds' advancement argument, we conclude it has not been waived.[78]

The Superior Court's reasoning logically flows as far as it goes; however, it is not clear to us the extent to which the court focused on the competing constructions of the disputed provisions.[79] We do not fault the Superior Court as the parties' arguments have continued to shift and evolve on appeal. The parties have presented several additional arguments to this Court regarding the proper construction of the primary policy that were not the focus of the proceedings below. Chief among these arguments is the Insureds' contention that enforcing the No Action Clause here renders the Advancement Provision a "nullity." Other arguments center on the Indemnity-only nature of the policy, the "believes to be covered" language in the Advancement and Allocation provisions, and the "judicially determined" language in various provisions.

---

[78] We have previously discussed the issue and scope of waiver as follows:

> We will not permit a litigant to raise in this court for the first time matters not argued below where to do so would be to raise an entirely new theory of his case, but when the argument is merely an additional reason in support of a proposition urged below, there is no acceptable reason why in the interest of a speedy end to litigation the argument should not be considered.

*Mundy v. Holden*, 204 A.2d 83, 87 (Del. 1964) (quoting *Kerbs v. Cal. E. Airways, Inc.*, 90 A.2d 652, 659 (Del. 1952)), *see also LGM Holdings, LLC v. Schurder*, _ A.3d _, 2025 WL 1162999, at *7 n.52 (Del. Apr. 22, 2025).

[79] The Insureds cite the May 9 Order and say that the Superior Court was under the mistaken belief that there was no dispute regarding the proper interpretation of the No Action Clause and, thus, limited its analysis to evaluating competing fairness or public policy considerations. *See* Opening Br. at 14–15 (citing *Origis*, 2024 WL 2078226, at *5). This statement by the Superior Court further supports our decision to remand for fuller consideration of the No Action issue.

What is needed is a more in-depth analysis that considers the combination of these provisions and how they function together. "Insurance contracts, like all contracts, are construed as a whole, to give effect to the intentions of the parties."[80] The appellate process would be better served by the parties presenting their more developed arguments to the trial court in the first instance.

In an attempt to provide some guidance to the court on remand, we suggest that the court more fully consider the question of the relationship between the No Action Clauses, Advancement and Allocation provisions, and how they were intended to function given the absence of a duty by the Insurers to defend.[81]

As mentioned, Great American and the Insureds also dispute how a court should apply the "believes to be covered" language in the Advancement and Allocation provisions of the policy.[82] Great American argues that it satisfied this requirement by calculating the

---

[80] *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 905 (Del. 2021).

[81] This would include the question of whether certain cases are distinguishable because they involve policies containing a duty to defend, whereas here, the Insureds have explicitly assumed the duty to defend. *See e.g.*, *Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252 (10th Cir. 1981); *Wilbanks Secs., Inc. v. Scottsdale Ins. Co.*, 215 F. Supp. 3d 1196, 1200 (W.D. Okla. 2016) (quoting *Sonic Auto., Inc. v. Chrysler Ins. Co.*, 2011 WL 4063020 (S.D. Ohio Sept. 13, 2011) (citing *Eureka Fed. Sav. and Loan Ass'n v. Amer. Cas. Co. of Reading*, 873 F.2d 229, 233 (9th Cir. 1989); *Owens-Corning Fiberglas Corp. v. Allstate Ins. Co.*, 660 N.E.2d 755, 760–62 (Ohio C.P. 1993); *W&J Rives, Inc. v. Kemper Ins. Group d/b/a Lumberman's Mut. Cas. Co.*, 374 S.E.2d 430, 434–35 (N.C. Ct. App. 1988); *Haxton*, 1990 WL 169650, at *1)); 7A Am. Jur. 2d Automobile Insurance § 564 ("An insurance policy's no-action clause does not bar the insured from seeking a declaration as to the insurer's duty to defend in the underlying lawsuit."); 7A Couch on Ins. § 105.8 ("A no-action clause does not bar an insured's cause of action against the insurer for failure to defend the injury action because the failure to defend action is based on breach of contract, not on the policy, and the insurer in denying the efficacy of the policy is precluded from raising the no-action clause as a defense.").

[82] Great American Answering Br. at 28–29; Reply Br. at 11–12; *see also* Great American Answering Br. at 21–22 (citing *Seeger v. Gulf Underwriters Ins. Co.*, 2005 WL 6772545, at *2

ten percent amount and stating it in its coverage letter.[83] By contrast, the Insureds argue that the parties have a duty to confer regarding this amount and that they have adequately pleaded that the Insurers failed to do so when they issued the coverage letter and filed their action in the Florida court.[84]

Here, the relevant language states that "[a]ny advancement shall be on the condition that:"

> the **Insureds** and the **Insurer** have agreed upon the allocated portion of the **Costs of Defense** attributable to covered **Claims** against the **Insureds**; provided, however, if there is no agreement on an allocation of **Costs of Defense**, the **Insurer** shall advance **Costs of Defense** which the **Insurer** *believes to be covered* under this Policy until a different allocation is negotiated, arbitrated or judicially determined.[85]

The parties have cited several cases on appeal construing similar provisions. Although they are not controlling here, they may be helpful in construing the "believes to be covered" language in combination with the other provisions at issue.

Further, the Allocation, Advancement and No Action provisions contain language referring to judicial determinations or adjudications. Although discussed at oral argument

---

(N.D. Ill. Mar. 17, 2005); *Daileader v. Certain Underwriters at Lloyd's, London*, 670 F. Supp. 3d 12, 43 (S.D.N.Y. 2023), *aff'd* 2023 WL 7648381 (2d Cir. 2023); *Mancha Dev. Co., LLC v. Houston Cas. Co.*, 2019 WL 6703541, at *7 (C.D. Cal. July 9, 2019); *Commer. Capital Bankcorp, Inc. v. St. Paul Mercury Ins. Co.*, 419 F. Supp. 2d 1173, 1185 (C.D. Cal. 2006)).

[83] Oral Argument Video at 25:20–26:37, https://courts.delaware.gov/supreme/oralarguments/.

[84] *Id.* at 11:58–12:16.

[85] App. to Opening Br. at A00108 (Compl. Ex. A (Great American Policy § VI.B.(3)) (bold in original, italics added).

before this Court, the meaning of "judicially determined" and "adjudication" as used in these provisions received little attention in briefing.[86]

Accordingly, based upon the additional contract-based arguments presented on appeal, we remand the No Action issue for further consideration by the Superior Court. We leave it to the discretion of the Superior Court as to what additional proceedings may be required.

### C. The Superior Court Correctly Granted the 2023 Insurers' Motion to Dismiss

We next turn to the questions of: (i) whether Paragraphs 158 – 160 of the Underlying Amended Complaint comprise a separate "claim" triggering coverage under the 2023 policies; and (ii) if so, whether they are excluded by the Policies' Prior Acts Exclusions. We begin with some background information.

#### 1. The Information Breach Claim Is Not a Separate "Claim" Triggering the 2023 Policies

The Underlying Lawsuit was brought by former investors in Origis and another entity associated with Origis. The Investors allege that Vanderhaegen exercised significant control over Origis prior to it being sold to a third party. They further allege that, prior to the sale, the Insureds engaged in deceitful conduct and other breaches of fiduciary duty that induced the investors to redeem their ownership interests in Origis in a manner that caused them economic damage. In sum, the Investors alleged that the Insureds perpetrated a fraudulent scheme to acquire the Investors' majority interest in Origis for a price far

---

[86] Oral Argument Video at 27:58–31:12; *id.* at 33:05–34:28; *see also id.* at 27:58–28:16; *id.* at 29:09–17.

below its true value, before turning around and selling it for hundreds of millions of dollars in profit.

In the Underlying Amended Complaint, the Investors alleged that they would have been able to allege those claims "with even more particularity" had the Insureds responded to their request for information made after November 18, 2021. Those three paragraphs from the Underlying Amended Complaint are as follows:

> 158. In conjunction with the Indemnity Notice Plaintiffs demanded access to the information from Origis necessary to carry out a complete investigation of their claims. Plaintiffs had the right to this information pursuant to Section 8.4 of the SRA.
>
> 159. Defendants produced only a small portion of the information Plaintiffs requested. Rather than a complete production, Defendants proposed a list of search terms, to which Plaintiffs proposed revisions. But then Defendants refused to produce all documents responsive to their own proposed search terms. Defendants instead produced the Antin transaction documents as well as an overwhelming amount of irrelevant technical information from the Antin data room. Beyond, that, Defendants produced *only* certain documents expressly relating to discussions with investment bankers and the financing of the buyout and largely did so from the email amount of a single custodian – Vanderhaegan. Defendants also failed to provide access to Origis employees for interviews as provided for in the SRA.
>
> 160. The failure to provide all information necessary for Plaintiffs to investigate their claims breached Plaintiffs' information access rights in the SRA. But for these breaches, Plaintiffs would be able to set forth their claims with even more particularity.[87]

The Insureds argue that those allegations state a Claim under the policy that stands apart from the other 249 paragraphs of the Underlying Amended Complaint because, according to Paragraph 160, the allegedly insufficient production of information "breached [the

---

[87] *Id.* at A00582 (Underlying Am. Compl. ¶¶ 158–160) (emphasis in original).

underlying] Plaintiffs' informational access rights[.]"  We agree with the Superior Court that these paragraphs fall short of constituting a Claim within the meaning of the policy.

A Claim is defined as follows:

A **Claim**, in relevant part means any:

1. Written demand first received by an **Insured** for monetary, non-monetary, declaratory or injunctive relief;

2.  Civil proceeding commenced by the service of a complaint or similar pleading;

….

against an **Insured** for a **Wrongful Act**[.][88]

The allegation that the Insureds breached an agreement with the Investors by failing to provide information might be a Wrongful Act, but no Claim followed.  The Underlying Lawsuit does not seek any relief related to the allegations in these paragraphs.  In the context of the Underlying Amended Complaint, Paragraphs 158 through 160 appear to address the Investors' attempt to explain that there could be additional information that would allow them to plead fraud with more particularity.  Further, the Underlying Lawsuit was not a civil proceeding against the Insureds "for" the allegations in Paragraphs 158 to 160.   We agree with the Superior Court's conclusion that those allegations are little more than an aside in a lengthy complaint that asserts a number of Claims—but only claims for pre-November 2021 Wrongful Acts as explained below.

---

[88]  *Id.* at A00276 (Compl., Ex. E (Bridgeway's Directors and Officers Liability § VI-Definitions, A.)).

2.  *Even If the Allegations Were a Claim, the Prior Acts Exclusions in the 2023 Excess Policies Preclude Coverage Entirely for the Underlying Lawsuit.*

The relevant insurance policies are also subject to the Prior Acts Exclusions which state as follows:

> The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that *alleges, arises out of, is based upon or attributed to, directly or indirectly, in whole or in part*, any actual or alleged **Wrongful Acts** which first occurred prior to <u>November 18, 2021</u>.[89]

In *Ferrellgas Partners L.P. v. Zurich American Insurance Co.*, this Court examined similar language in a run-off exclusion stating as follows:

> The Underwriter shall not be liable for Loss on account of, and shall not be obligated to defend, any Claim made against any Insured based upon, arising out of, or attributable to any Wrongful Acts including any Interrelated Wrongful Acts, taking place in whole or in part subsequent to 06/24/2015 [the beginning of the Run-Off Coverage Period].[90]

We observed that "[t]he Run-Off Exclusion's meaning is clear. If a claim arises from Wrongful Acts that take place either partially or completely after June 24, 2015, then the claim is excluded from coverage. The Run-Off Exclusion incorporates any Interrelated Wrongful Acts."[91]  We found that the focal point of the Claim was a February 2016 breach

---

[89]  *Id.* at A00334 (Compl., Ex. F at 7) (bold and underlines in original, italics added).  There are slight differences in the way each Insurer chose to word this exclusion, but the substance of the exclusions has uniform application here.

[90]  *Ferrellgas P'rs L.P. v. Zurich Am. Ins. Co.*, 319 A.3d 849, 866 (Del. 2024).

[91]  *Id.*  We stated that:

> Analysis of the issue of whether Zurich must advance defense costs can be summarized into two steps:  first the meaning of the pertinent provisions in Zurich's insurance policy … must be ascertained to define the scope of the policy's coverage.  Second, the nature of the claims in the underlying litigation must be analyzed with reference to the Zurich policy.

*Id*. at 852.

and an inability to pay an arbitration award due to a diversion of assets. This led us to conclude that "[b]ecause the breach of the RSA, including all the acts which caused it to happen, occurred either in whole or in part after June 24, 2015, Zurich has no duty to advance defense costs for this matter because of the Run-Off Exclusion."[92]

The result is even clearer in this case. The Superior Court correctly defined the question as "whether the failure to comply with the Investors investigation 'arose from' the conduct that necessitated the investigation[]" and the court correctly answered that it did.[93] Here, the first allegation is an excluded wrongful act and the Insureds rely on the second allegation which is a cover-up of the wrongful act. We agree with the Superior Court that "it is difficult to conceive a much better fit for the term 'arising out of' than the way a cover-up is predicated on an initial wrong."[94] Accordingly, even if the three highlighted paragraphs comprised a Claim, such a Claim would be excluded by the Prior Acts Exclusions.

## V.   CONCLUSION

For the reasons set forth above, we **AFFIRM** the Superior Court's order granting the Insurers' Motion to Dismiss as to the 2023 Insurers and **REMAND** for further consideration as to the 2021 Insurers.[95] Jurisdiction is not retained.

---

[92] *Id.*

[93] *Origis*, 2024 WL 2078226, at *8.

[94] *Id.*

[95] To the extent that the Excess Insurers raise additional arguments not discussed in this Opinion, we decline to address them in the first instance and leave them for the Superior Court to consider, in its discretion on remand.